Filed 5/14/14  P. v. Thomas CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B242051 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA116449) |
| v. | |
| RONALD RAY THOMAS, | |
| Defendant and Appellant. | |

---

APPEAL from the Superior Court of Los Angeles County, Kelvin D. Filer, Judge. Modified and affirmed with directions.

Susan Wolk, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez, David Zarmi and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Ronald Ray Thomas of attempted murder, assault with a firearm, and felon in possession of a firearm, and found true that Thomas committed the crimes in association with a criminal street gang. Thomas filed this timely appeal.

## BACKGROUND

An information charged Thomas with the attempted premeditated murder of Michael Watson, in violation of Penal Code[1] sections 664 and 187, subdivision (a) (count 1); assault with a firearm on Umeka Holley, in violation of section 245, subdivision (a)(2) (count 2); and felon in possession of a firearm in violation of section 12021, subdivision (a)(1) (count 3). The information also alleged as to counts 1 and 2 that Thomas personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (c)), and that Thomas committed the offenses in all counts in association with a criminal street gang, in violation of section 186.22, subdivision (b)(1)(C). Count 3 alleged that Thomas had a prior conviction in 2005 of violating section 245, subdivision (c) (assault on a peace officer or firefighter with a deadly weapon or by means of force likely to produce great bodily injury).

Thomas pleaded not guilty and went to trial, after which a jury found him guilty on all three counts and found the gang allegations true. An amended information alleged as to counts 1, 2, and 3 that the 2005 prior conviction was a prior strike pursuant to sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i). Thomas admitted his prior conviction allegation. The court sentenced Thomas to 15 years to life on count 1 with the gang enhancement, doubled by the prior strike conviction enhancement, plus 20 years for the firearm enhancement; 15 years on count 2 (the midterm of three years, doubled by the prior strike conviction enhancement, plus five years for the gang enhancement and four years for the firearm enhancement), to run concurrently; and the midterm of two years on count 3, to run concurrently. The court struck the gang enhancement on count 3, ordered Thomas to pay fees, fines, and restitution, and awarded presentence credit.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

At trial, Watson testified that Umeka Holley was the mother of his six children. Holley (who at the time of the shooting was pregnant with twins) and the children lived in the Imperial Courts housing project, and Watson would take the train to visit them. Watson was a member of the East Coast Crips gang. Another gang, PJ Watts, controlled the Imperial Courts area; the two gangs got along. In January 2011, two weeks before Watson was shot, he was walking through Imperial Courts on his way to see the children when a black man approached him, "banging" on Watson and saying, "Where you from? Where you going? Stuff like that. Who you know over here," and mentioning PJ Watts. Watson's response was that he had been in and out of the projects and was a threat to nobody. The man asked if he knew where he was, and Watson responded, "'Yeah, P.J. Watts,'" and walked away. He thought nothing of it, believing the man was drunk.

On January 20, 2011, just after 5:00 p.m., Watson again took the train to visit Holley, and again a man came up to Watson and aggressively asked him where he was from and who he was. Watson answered, concerned because his children were nearby; they ran into the house. Watson was not sure if it was the same man from two weeks before, but it was not Thomas. The man then asked if his children liked living there, and Watson got ready to fight because that felt like an indirect threat to his family. The man "walked away like a coward." The man wore a cast on one of his hands.

Later, the man returned riding a bike. Watson was outside waiting for his son to come home from an after-school program, and Holley was standing in the door. Watson's children screamed, "'Daddy, here he come,'" and Watson told Holley and the children to go into the house. Watson walked toward the man. Holley's brother and sister approached the man on the bike and asked him what was going on, and the man said, "'Move out the way.'" The man told Watson, "this is your last chance, 'get the fuck out of here.' And I told them 'fuck you.' . . . 'Do what you going to do,'" and the man fired five or six shots. Watson said, "I'm going to get you," and began to run. The first shot hit Watson in the ear, where he began to bleed. When he reached Holley and saw she had been hit in the stomach, he called 911.

3

Watson testified that he told the officer who responded to the scene that a man accompanied by two others started talking to him, but he did not remember whether he told the officer that it was the same man that two weeks earlier had warned him about being in Imperial Courts. Watson denied that he told the officer the man said, "This neighborhood is PJ." He did tell the officer that the man pulled a gun out of his waistband and shot at him. At that moment, Watson "didn't really want to talk," because the children's mother was on the way to the hospital, the children were screaming and crying, "[e]verything was wild," and the officer was threatening to put him in jail.

Shown People's exhibit 2A, Watson identified his signature dated January 25, 2011 and a circled photograph in a six-pack. The detective, not he, had made the circle and told him whom to identify, although Watson initialed it. Watson admitted he had made the identification, but denied it was the person who confronted him two weeks earlier and then later shot at him. Watson did not see the person in court, even after Thomas removed his glasses at the prosecutor's request. The prosecutor played a recording of Watson's interview with a Detective Strojny, in which he did make an identification of the circled photograph.

Watson had not seen the video of the shooting (People's exhibit 3). Shown the video of the shooting as it happened, Watson identified himself and the person he had described, but he did not see the person in court. Watson believed a snitch was "[t]he scum of the earth," and if he was labeled a snitch, "[i]t could be a lot of consequences, repercussions behind that," to him and to his family. He could be labeled a snitch if he identified someone in court. People in the streets, in his gang and others, would be out to get him. Watson "want[ed] to have nothing to do with this, period," and was in court only because he had been ordered to be there. Holley had since moved and although he had not gone back to the area, he thought he would have no problems if he did, and no one had called him about his testimony.

On cross-examination, Watson stated that at the time of the shooting he was on parole for possession of cocaine, and felt pressure to identify someone or go to jail. When shown the photographs five days later, he "just picked any picture." The shooting

4

was not gang-related, but a personal issue with the shooter. If it were gang-related, it would cause a gang war. He had not been paying attention to what the shooter was wearing, but he was wearing something like a cast.

Holley testified that she was concerned when Watson told her about the incident before the shooting. On the day of the shooting, she went outside when she heard Watson talking with someone. Watson said he was outside to look for his kids, and the other person said, "'I'm the same guy that you seen the other day.'" Watson said, "'I don't know you,'" and the other man, who was with two others, told Watson, "'Get out the hood' or it might be his last chance, and asked Watson if his kids liked living there. The man asked one of the two other men if he could borrow a motorbike, and walked off. When she heard the children say, "'Daddy, here he come,'" she saw the man come back alone, riding on a regular bicycle. She had told the detective that her stepsister and brother walked up to the man to tell him that everything was okay. Watson told her to go in the house, but she stayed in the doorway, worried that Watson "was going to get something." The man got off the bike, fired many shots, and a bullet grazed her stomach. She went to the hospital, but she was all right and the babies were born healthy.

The man who shot at Watson was black, had a blue cast on his arm, and was not wearing glasses. Holley was not sure whether she saw him in court. When Detective Strojny showed her a set of photographs on January 26, she pointed at photograph 1 as the person she believed was the shooter, and signed and initialed the form. A recording of her interaction with Detective Strojny was played for the jury. She did not want to testify, and was there to comply with the court's order.

On cross-examination, Holley identified the woman who walked toward the shooter as Rachel Bragg, who was related to her sister. She had not discussed with Watson his interview with the police one day before she made the photo identification. No one had threatened her. On redirect, Holley stated she was afraid to testify, because what she said could get back out on the street and harm her children.

Los Angeles Police Department (LAPD) Officer Justin Drury testified that on January 20, 2011 he received a radio call to respond to a shooting in Imperial Courts and

arrived at the same time as the paramedics. Officer Drury saw Watson bleeding from his ear and a pregnant Holley bleeding from the stomach. Holley told him she did not see what happened, and Watson was worried about Holley. Watson described the shooter as a six-foot tall black man, about 200 pounds and 25 years old, wearing khaki shorts, a white shirt, a black hat, and a cast on his right arm. Watson also told Officer Drury that two weeks earlier he had had a confrontation with the shooter, who came up to him and asked him where he was from and who he was. On the day of the shooting the shooter approached him again with two other people, and asked him who he was and why he was there. Watson replied that he had told him before, and he was there to see his children. The shooter told Watson to leave, left on his bike, and returned five minutes later. When Watson approached him, he dropped his bike, produced a revolver, and began to shoot at Watson. On cross-examination, Officer Drury stated that he wrote in his report that Watson "said he was East Coast," but there was nothing in the report about PJ Watts. He never handcuffed Watson or threatened to arrest him for a parole violation.

LAPD Officer Manuel Castaneda testified that he was assigned to monitor the 32 videocameras that were set up throughout Imperial Courts. The cameras recorded continually and could be controlled remotely to zoom in and out. In a previous assignment, he had been responsible for monitoring the PJ Watts Crip gang, which claimed the Imperial Courts area. On January 20, Officer Castaneda heard the call about the shooting and immediately checked to see if the camera had caught it. He was able to rewind and see the crime occur. The recording, People's exhibits 3A and 3B, were played for the jury, and the jury also saw stills from the recordings. Officer Castaneda identified Thomas as the man in the black hat in the video of the shooting. He also recorded Thomas's arrest on January 25, from which a hat that looked the same was booked into evidence. The video also showed Thomas taking off the hat and placing it on a pole when the police arrived to arrest him. The hat was a black baseball cap with a "C" on the front, a "5950 gold sticker" on the upper brim, and two other stickers on the lower brim. Thomas removed his glasses and put on the hat for the jury. On cross-

6

examination, Officer Castaneda identified what appeared to be a dark blue cast in one of the still photographs; he could not tell if there were metal rods under the fingers.

LAPD Detective Dan Strojny, the investigating officer, testified that in a telephone interview on January 24, 2011, Watson had described the shooter as a six-foot, 25-year-old black man wearing a black baseball cap, white t-shirt, and khaki shorts, with a cast on one arm, riding a bicycle. The same man had challenged Watson a few weeks earlier for being in PJ Watts territory, telling him he "didn't recognize him, didn't like him being there, and that he needed to leave." He also told Detective Strojny that the man who shot at him was the same man, who again challenged him for being in PJ Watts territory. Detective Strojny met in person with Watson the next day, January 25, 2011 (a recording of the interview was previously played for the jury). Watson insisted he would not go to court because "[he has] to still walk around, be around here," but he wanted to identify the shooter because "he could have hurt my family." Shown the group of photographs, he immediately identified photograph 1 ("Oh, that's his ass right there"), circling the photograph and initialing it; the photograph was of Thomas. Watson reiterated that he was not going to court, "[c]ause he should be on camera." If he went to court, "it's going to be like ok well, he's telling on him and everybody's going to know. So it's going to spread all over LA and now my own homeboys might come looking for me for telling on this dude. Now my life is in danger. Period." The shooting "was for no reason at all. I never done nothing to him." The "whole East side" would be out to get Watson: "[W]e going to get his ass soon as we see him, because he told on woop de woop de woo," or they would go after Watson's family.

The next day, January 26, Detective Strojny talked to Holley on the phone and later met with her. Holley told him the man who argued with Watson and later shot him was wearing a blue cast on one of his arms. The man had been agitated and upset, telling Watson it was PJ Watts Crip territory and Watson was not supposed to be in the projects. The man asked some bystanders if he could borrow a motorized bike, and they told him no. When Detective Strojny later met with Holley in person, he showed her a six-pack photographic lineup and like Watson, she identified photograph 1 as the shooter.

7

At the time of his arrest, Thomas had tattoos depicting Imperial Courts, PJ Watts, and cliques within the gang on his shoulders, biceps, neck, arm, cheek, and hand. He was not wearing a cast but there was a abrasion to the side of his right hand, and swelling and discoloration in the hand and wrist area. The video of the shooting made it difficult to tell, but there appeared to be something on the shooter's arm.

A state employee testified that he had met with Thomas on January 13, 2011, and Thomas had a blue cast on his right arm.

LAPD Officer Francis Coughlin testified as a gang expert. Gang tattoos were earned by committing crimes, and a novice gang member could not put a tattoo on his face or he would be disciplined. Respect for other gang members was very important, and a member who was labeled a snitch would be subject to anything from verbal threats to beatings to death. Gangs controlled their territory through fear and intimidation. If an unknown male walked through Imperial Courts, a gang member would "check him, ask him what gang is he from." A response usually led to violence, and "[o]ftentimes the aggressor doesn't care about the answer." "PJ" stood for "Project," and PJ Watts were Crips who claimed Imperial Courts as their territory. In his experience, PJ Watts was not a rival of the East Coast Crips. Because the projects were such an enclosed area, an East Coast Crip would probably be checked or "hit up" if he came through. PJ Watts's primary activities included tagging, robbery, selling drugs, shootings, killings, and rapes.

Thomas's gang moniker was "Ron Ron" or "Little Ronnie," and his tattoos included "Squad Up," which was a rallying cry for PJ Watts. His arrest took place near a PJ Watts hangout. Officer Coughlin opined that Thomas was a gang member by reviewing his earlier admissions, his tattoos, and his criminal history. Given a hypothetical mirroring the facts of the case, Officer Coughlin's opinion was that the shooting was done to benefit PJ Watts, and also enhanced the shooter's reputation in the gang. By returning after he was challenged, the victim almost forced the gang to confront him to "reinforce[e] what this gang is about, that if you don't listen to what I tell you to do we will shoot you in broad daylight," not just to the gang world but to everyday people. The shooter would also get enhanced respect. Shooting at a woman would also

8

benefit the gang, and carrying a firearm as felon improved the individual gang member's status and reputation. On cross-examination, Officer Coughlin testified he had had no contact with Thomas.

For the defense, Thomas's wife Shatana Simmons testified that in January 2011, Thomas wore a dark blue cast. His last two fingers were taped and there was a splint on the other two fingers. Simmons removed the cast on January 24, because it was irritating Thomas. Simmons had walked through the projects and photographed people to show that lots of people wore beige and white and hats with a gold sticker.

Rachel Bragg testified that she was Holley's stepsister and had known Watson for years. She saw the shooting on January 20, and she appeared in the video with her little brother. The man who did the shooting was not Thomas, but a man she knew called Turtle. She ran away after the shooting, but she was testifying because Thomas's wife asked her to. The shooter wore a purple "sleeve" like the sweatband basketball players wore on their shooting arms. Despite his tattoos, she did not know Thomas to be a PJ Watts. Her older brother Kenneth might be affiliated with PJ Watts, and she had seen Thomas around. PJ Watts claimed Imperial Courts. She did not expect to be labeled a snitch.

In rebuttal, an LAPD officer testified that Kenneth Bragg was a member of PJ Watts with visible gang tattoos. The parties stipulated that Thomas was a convicted felon.

## DISCUSSION

### I. Admission of gang evidence and sufficiency of evidence

Thomas argues that the trial court abused its discretion when it admitted the gang evidence, much of which was "overkill" and unnecessary to prove the gang allegations.

Thomas did not object at trial. He therefore has forfeited this claim. (*People v. Lindberg* (2008) 45 Cal.4th 1, 48; *People v. Partida* (2005) 37 Cal.4th 428, 433–434.)

Even if Thomas had made a proper objection, we would not find an abuse of discretion in admitting the evidence. Gang evidence is subject to the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than

9

character, "is not more prejudicial than probative, and is not cumulative." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) Where, as here, the information alleges a gang enhancement, the prosecution may present expert testimony regarding criminal street gangs. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.)

Further, "[g]ang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.) If "evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. [Citations.]" (*People v. Martin* (1994) 23 Cal.App.4th 76, 81.) "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)

The gang evidence was essential to establish Thomas's motive for shooting Watson. The prosecution theory to explain a seemingly senseless shooting was that although Watson and Thomas did not know each other, Thomas targeted Watson because he was a member of a different gang and was in PJ Watts territory. (See *People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1168.) The gang evidence was also relevant to explain that both victims, each of whom identified Thomas as the shooter soon after the crime, failed to identify Thomas in court because they feared being labeled snitches. These "disparities in the witnesses' testimony justified use of gang evidence to provide a plausible explanation for them." (*Id.* at p. 1169.) "Gang evidence is also relevant on the issue of a witness's credibility," including evidence that a witness fears retaliation or is afraid to testify. (*Id.* at pp. 1168–1169.)

Thomas argues that the details of the gang expert's testimony were unduly prejudicial. A properly qualified gang expert may testify about a wide range of issues, including a gang's territory, retaliation, graffiti, hand signals, tattoos, and clothing. (*People v. Lindberg*, *supra*, 45 Cal.4th at pp. 46–47.) These details were clearly relevant to the allegation that the shooting was committed in association with a criminal street gang, and to demonstrate that Thomas's tattoos showed that he was a member of PJ

10

Watts, and that Thomas shot Watson for venturing into PJ Watts territory. *People v. Albarran* (2007) 149 Cal.App.4th 214, which Thomas urges us controls this case, involved a very different situation. The defendant objected to the gang evidence, and after the jury found the defendant guilty and found the gang allegations true, the court granted a new trial motion on the gang allegations, finding they were not supported by sufficient evidence. The defendant appealed from the trial court's denial of the motion for new trial on the charges of attempted murder, shooting at an inhabited dwelling, and attempted kidnapping, and the court of appeal concluded that the gang evidence was not relevant to the underlying charges, and was so highly prejudicial that reversal was warranted. (*Id.* at p. 217.) Here, however, Thomas did not object, the evidence (as we conclude below) was sufficient to support the gang allegations, and the gang evidence was highly relevant to Thomas's motive for the shooting.

After arguing that the court allowed "an unwarranted amount of prejudicial gang evidence" which was "overwhelming," Thomas makes a bewildering about-face and argues that the evidence of gang involvement was insufficient. We review this claim by examining the entire record in the light most favorable to the judgment, to determine whether there is substantial evidence that supports the jury's verdict, reversing only if """"on no hypothesis whatever is there sufficient substantial evidence to support the verdict."""" (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329.) Thomas does not argue there was no substantial evidence of gang involvement. Instead, he points to Watson's testimony that the shooting was personal, not gang related, that Holley did not report retaliation or threats, and that Officer Drury's report did not mention PJ Watts. He also acknowledges, however, that Detective Strojny testified that both victims told him directly after the shooting that it involved a dispute over Watson's presence in PJ Watts territory. Where, as here, there is a conflict in the evidence, we resolve it in favor of the judgment in determining whether the evidence is sufficient. (*Id*. at p. 1331.) The evidence of gang involvement was sufficient.

Thomas also argues that the evidence was insufficient to support his convictions for attempted murder, assault with a firearm, and felon in possession of a firearm. He

points to the witnesses' failure to identify him in court, his lack of motive, conflicting evidence regarding whether he wore a cast or a sleeve, and Watson and Holley's lack of credibility. Again, we find the evidence sufficient. Watson and Holley both identified Thomas in the photographic lineups. We have already determined that their testimony and the gang evidence support the conclusion that Thomas's motive was to protect PJ Watts territory. The conflicting evidence regarding what the shooter wore on his arm is resolved in favor of the judgment. Finally, whether Watson and Holley were credible is "'the exclusive province of . . . the jury,'" which chose to believe their testimony. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.)

## II. Prosecutorial Misconduct

Thomas did not object to any of the prosecutor's alleged misconduct and request that the trial court admonish the jury, and he does not point to anything in the record that indicates that an admonition would have been futile, so he has forfeited this claim. (*People v. Duff* (2014) 58 Cal.4th 527, 567.) In any event, it is meritless.

All Thomas's claims of misconduct relate to closing argument. First, the prosecutor explained that the jury was to look at the totality of the evidence, "not just one little piece," and continued: "The reasonable doubt instructions tells you, you look at the whole thing. And if at the end of the day when you look at the big picture if it points to the defendant's guilt, you find him guilty. At the end of the take [sic] if it doesn't point to the defendant, you find him not guilty. But it's the big picture and there's little pieces. Some are bigger pieces and some are smaller. But there's pieces to look at." Thomas argues this misstates the burden of proof by characterizing "reasonable doubt" as merely pointing to the defendant's guilt. The statement, however, did not conflict with but expanded upon the court's instruction that Thomas was presumed to be innocent, and "[t]his presumption requires that the People prove the defendant guilty beyond a reasonable doubt. . . . [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true," and "you must impartially compare and *consider all the evidence that was received throughout the entire trial*." (Italics added.) We presume the jury followed the court's proper instruction, including its additional

12

instruction that the jury was to follow the instructions if an attorney's comments appeared to be in conflict. (*People v. Otero* (2012) 210 Cal.App.4th 865, 873.) Further, the statement did not demean the reasonable doubt standard by "'leav[ing] the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence,'" or tell the jury to guess or jump to a conclusion. (*Id.* at p. 872.)

Thomas also points to statements by the prosecutor which he claims appealed to the passion and prejudice of the jury. It is improper to make arguments to the jury that imply that "'"emotion may reign over reason,"'" and present irrelevant evidence or inflammatory rhetoric designed to invite an irrational response. (*People v. Linton* (2013) 56 Cal.4th 1146, 1210.) In opening argument, the prosecutor referred to an instruction telling the jury that it may consider gang evidence when evaluating the credibility of a witness, and stated that witnesses who testified in gang cases "know what happens when their names get thrown in the mix out in the street. People die." This explained why Watson and Holley testified that they did not circle Thomas's photograph although the recordings of the interviews show that they did: "We're in a world where behind the scenes there's the big gang. Snitches die," and Watson and Holley would have to look over their shoulders for the rest of their lives. The prosecutor continued that the jury could not consider "sympathy for the victim. Sometimes I have murder victims, innocent, children, bystanders of shooting," but the jury's role was to be neutral. These statements cautioned the jury to focus on the facts and *not* to be aroused by passion or prejudice based upon sympathy for victims, such as the attempted murder victim (Watson), the bystander (Holley), or child victims (like the couple's six children who were "bystanders" during the confrontation). Given the facts of the case, this was not an appeal to prejudice.

Later, the prosecutor stated: "The hardest thing that I had done as a prosecutor is to put on an eight-year-old child molest victim on the stand in front of a person who had molested her for four years," and he had put Watson on the stand because "[he has] to do it," although he knew what could happen to Watson. The prosecutor continued that in that same child molestation case, the defense attorney argued to the jury that the

13

prosecutor's use of the word "molest" was inflammatory. The prosecutor argues that putting Thomas's gang tattoos into evidence was not inflammatory. This was in rebuttal to defense counsel's closing argument, which pointed out that there were nine photographs of tattoos, but no photographs of a gun or in-court identifications, and suggested that the prosecutor called this a gang case to make the jury believe that Thomas was guilty. Defense counsel suggested that if it was true that "snitches die," the prosecutor had put Watson on the stand because he was unconcerned about those consequences. The prosecutor's statements, while inadvisable, were in rebuttal to defense counsel's intimation that the prosecutor was trying to sway the jury with the gang evidence and photographs of tattoos, and were also offered to explain that possible negative consequences do not deter prosecutors from putting a witness on the stand (after defense counsel suggested that the prosecutor would not have put Watson on the stand if the gang allegation were true, or at least, that the prosecutor was unconcerned about Watson's welfare). A reasonable jury would not have interpreted the prosecutor's remarks as an effort, unrelated to the evidence, to arouse prejudice or passion. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1379.)

Finally, Thomas argues that the prosecutor referred to facts not in evidence. First, the prosecutor argued that at the time of the shooting, Watson was on his way to visit his children in Imperial Courts because "he can't live there. That's not going to happen. So he's visiting." This brief reference followed the prosecutor's argument that Watson was an East Coast walking through PJ Watts territory, and Thomas had warned Watson not to return. The prosecutor could permissibly invite the jury to conclude, given the evidence that PJ Watts controlled the territory, that Watson could not live there because he was from another gang. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1074.) Second, the prosecutor once misspoke, saying that Thomas confronted Watson a few days before the shooting; the prosecutor, however, twice stated immediately afterward that Thomas confronted Watson two weeks earlier. This is a single mistake, not misconduct. Third, Thomas argues that the prosecutor misstated Simmons's testimony as "[Thomas's] whole hand was wrapped up," but she testified that two of his fingers were taped and there was

14

a metal splint on the other fingers, which is consistent with his entire hand being wrapped up.

There was no misconduct, and therefore Thomas's counsel did not provide ineffective assistance in failing to object to the prosecutor's statements.

## III. Lesser included offense

Thomas argues that the trial court was required to instruct the jury sua sponte on assault with a firearm as a lesser included offense of attempted murder (count 1), as that count also alleged a firearm enhancement. We agree with *People v. Alarcon* (2012) 210 Cal.App.4th 432, 436, 439, that "under the accusatory pleading test, gun use . . . allegations accompanying an attempted murder charge do not render assault with a deadly weapon a lesser included offense of the charged attempted murder[] [Citations.]," so that "the trial court did not err in declining to instruct on assault with a deadly weapon as a lesser included offense of attempted murder." The cases to the contrary cited by Thomas merely describe the defendants' convictions using the phrase "lesser included offense of assault with a firearm," without any analysis whether an instruction on a lesser included offense was required. (*People v. McCloud* (2012) 211 Cal.App.4th 788, 791; *People v. Esquibel* (2008) 166 Cal.App.4th 539, 544.)

## IV. Filing an amended information

Thomas argues that the trial court erred when, after the jury had been excused, it allowed the filing of an amended information alleging a prior strike conviction.

The initial information, filed on April 6, 2011, alleged in connection with count 3 (felon in possession of a firearm) that Thomas possessed a handgun and had a prior conviction in 2005 for assault with a deadly weapon, section 245, subdivision (c). Thomas stipulated to the prior conviction for the purposes of count 3 on December 1, 2011. On December 13, 2011, just before the jury returned the guilty verdicts, the court advised Thomas "[i]f the verdict is guilty, then this jury would need to determine whether or not the prior allegations that are alleged against you on *all three counts* . . ." and Thomas's counsel interjected, "Just one prior. Let me explain it to him." (Italics added.) Counsel and Thomas conferred, and counsel then stated, "We'll waive jury on the prior."

15

The court asked Thomas whether he understood that he had the right to a jury determination whether the prior was true, and whether he would waive a jury on that issue. Thomas said yes. The guilty verdicts were returned, including as to count 3 a true finding that Thomas had "theretofore been duly and legally convicted of a felony, as charged in count 3 of the Information." After the court excused the jury, the court asked Thomas whether he agreed to waive time and "set the matter over for a court trial or— your counsel will tell you about admitting the prior, but that's beyond the period that you are normally entitled to be sentenced." Thomas agreed.

The prosecution subsequently filed an amended information on January 6, 2012 (or on the 9th as reflected in a minute order) alleging the 2005 felony conviction (alleged in the original information as a prior conviction in count 3 only) as a prior strike conviction pursuant to sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) through (i), as to all three counts. On January 13, 2012, the prosecutor advised Thomas that the only change in the information was the language stating that the prior alleged in the information was a strike. Thomas's counsel did not object, and entered a denial. The court asked, "Have we done anything with the prior yet?" and the prosecutor answered, "No, it's pending."

On May 25, 2012, Thomas advised the court that he would admit the prior. The prosecutor then described the 2005 prior, stated that the allegation was to all three counts, and reminded Thomas that his attorney had indicated that he would admit the prior conviction, and that Thomas had waived his right to have a jury determine the truth of the prior conviction. After further advisements, Thomas waived his right to a bench trial and admitted that he had been convicted of the prior offense "within the meaning of the three strikes law," and also stated that he understood that the effect of the prior strike would be to increase the possible sentence on each of the three counts. The court accepted the waiver and found the prior allegation true. The prosecutor subsequently "in abundance of caution" asked Thomas again whether he still wished to admit the prior given that "the base is doubled from 15 to 30 years as to count 1 alone," and Thomas stated that he understood and still wished to admit his prior conviction.

16

In *People v. Tindall* (2000) 24 Cal.4th 767, 782 (*Tindall*), our Supreme Court held that in "the absence of a defendant's forfeiture or waiver," section 1025, subdivision (b), requires that the same jury that decided the defendant's guilt must also determine the truth of allegations of prior convictions. Therefore, once the jury has been discharged and it cannot determine the truth of prior conviction allegations, the information may not be amended to add such allegations. In *Tindall*, the defendant had waived jury trial on a prior prison term conviction and two prior convictions. After the jury was discharged following a guilty verdict, the court allowed the prosecutor, over Tindall's continuing objection, to amend the information to allege three prior strikes and additional prior prison term convictions. The defendant then invoked his right to a jury trial and the court allowed him to withdraw his previous waiver on the original prior conviction allegations. The amended allegations were tried before a new jury, which failed to reach a verdict; the trial court granted a mistrial and impaneled a third jury, which found the three prior strikes to be true. (*Id.* at pp. 770–771.) The Court of Appeal affirmed the trial court's order allowing the postdischarge amendment of the information, and the Supreme Court reversed, because as provided by section 1025 subdivision (b), the jury that tries the prior conviction allegation must be the same jury that tried the issue of guilt, "unless the defendant waives jury trial." (*Id.*. at p. 772.) This right to the same jury meant that the trial court exceeded its jurisdiction when it permitted the information to be amended after the discharge of the jury that determined guilt, and the subsequent proceedings were void. (*Id.* at pp. 782–783.)

Here, Thomas did not object to the postdischarge amendment of the information, did not invoke his right to a jury trial (instead waiving it), and did not seek to withdraw his waiver, instead personally affirming his waiver and admitting his prior conviction within the meaning of the three strikes law. The failure to raise the issue of a section 1025 violation resulted in forfeiture. As the Supreme Court stated in *Tindall*, "a court's act in excess of its jurisdiction is valid until set aside, and a party may be precluded from setting it aside, due to waiver . . . . [A] violation based on section 1025 *will* accommodate the circumstance of a defendant's forfeiture or waiver . . . ." (*Tindall*, *supra*, 24 Cal.4th

17

at p. 776, fn. 6.)  Further, we note that unlike *Tindall*, the prior conviction alleged in the amended information as a strike as to all counts was the same prior conviction alleged in the original information as to count 3, on which Thomas had waived a jury trial and then stipulated to the conviction.  This also distinguishes Thomas's case from *People v. Gutierrez* (2001) 93 Cal.App.4th 15, 20, in which the defendant waived his right to jury trial on allegations of California priors, the original jury was discharged, and the trial court found the California prior allegations to be true.  The prosecution filed a motion to amend the information to allege two Nevada prior convictions, and the defendant objected; the court denied the objection and granted the motion to amend.  A new jury found one of the Nevada convictions to be true, resulting in a five-year enhancement. (*Id.* at pp. 21–22.)  The court of appeals reversed, pointing out "[d]efendant only waived his statutory right to have the same jury decide the guilt issue on the underlying offenses and the truth issue on the *California* prior allegations," and "did object when the prosecutor moved to amend the information to add the Nevada state robbery conviction allegations." (*Id.* at p. 24.)

No violation of section 1025 occurred where Thomas failed to object, thus forfeiting his statutory right, and waived jury trial on the same prior conviction alleged as a strike in the amended information.  Further, the failure to object was not ineffective assistance of counsel, as Thomas has not shown prejudice.  There is no reasonable probability that the trial court would have sustained an objection where Thomas had already waived jury trial and admitted the same prior, having been advised it would apply to all three counts.

## V.    Denial of new trial motion

Thomas filed a motion for new trial, arguing (along with other issues he does not raise on appeal) that newly discovered evidence required the trial court to grant the motion.  The trial court's denial of the motion "'"""rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'"""  (*People v. Howard* (2010) 51 Cal.4th 15, 42–43.)  The trial court considers whether (1) the evidence, not its materiality, is newly discovered;

18

(2) the evidence is cumulative; (3) the evidence would make it probable that a different result would obtain after a retrial; (4) with reasonable diligence, the party could not have discovered and produced the evidence at the trial; and (5) these facts are shown by best evidence. The trial court may also consider the credibility and materiality of the evidence. (*Id.* at p. 43.)

The new trial motion included a brief declaration from Trayveon Bragg (the brother of trial witness Rachel Bragg), stating that he witnessed the shooting and "saw the shooter immediately before he started to fire and it was not Ronald R. Thomas, whom I've known most of my life," and he would so testify if called as a witness. First, Thomas did not argue that the evidence was newly discovered. Second (as the trial court pointed out), the evidence was cumulative; Rachel Bragg testified that the shooter was not Thomas. Third, given that it was cumulative, the evidence did not make a different result probable if there were a retrial. Fourth, Thomas could have produced the evidence at trial; his counsel stated that Bragg was a minor at time of trial and there was "some difficulty in him wanting to testify," but did not describe any effort to get him to testify (for example, by subpoena). Four of five factors militate against granting the motion, and no abuse of discretion occurred.

## VI. Sentencing issues

Thomas argues that the minute order must be modified, and the abstract of judgment corrected, because the minute order states that Thomas's sentence on count 1 is an indeterminate term of 30 years to life, and then states that the 20-year sentence on the firearm allegation enhancement was "mandatory and consecutive" and was "to run consecutive to the 30 years." Respondent concedes, and we agree, that modification is necessary. Section 669, subdivision (a) provides: "Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046 or pursuant to any other section of law that establishes a minimum period of confinement under the life sentence before eligibility for parole." An enhancement

19

such as the firearm enhancement in issue here, providing for a specified number of years, is determinate and subject to section 669, and enhancements are to be imposed full term. (*People v. Felix* (2000) 22 Cal.4th 651, 655.) The determinate term for an enhancement should be served first, followed by the indeterminate life term. (See *People v. Garza* (2003) 107 Cal.App.4th 1081, 1096.) Section 186.22, subdivision (b)(5), provides for a 15-year minimum parole eligibility term and is not a separate enhancement. (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1004.) The trial court should have stated that Thomas's total term was 20 years plus life in state prison with a minimum parole eligibility date of 30 years.

Other sentencing errors also are not disputed. Thomas was sentenced to a two-year concurrent sentence on count 3; however, because of the prior strike conviction the court was jurisdictionally required to either double the sentence to four years, or strike the conviction. (*People v. Sok* (2010) 181 Cal.App.4th 88, 95, fn. 6.) Therefore, the matter must be remanded for resentencing.

Further, Thomas was entitled to conduct credit consisting of 15 percent of actual time served (§ 2933.1.), but the trial court did not award conduct credit. Thomas's actual presentence credit was 505 days, and therefore the abstract of judgment must be amended to reflect 75 days of presentence conduct credit for a total of 580 days. The trial court imposed a court security fee for each of the three convictions, but only imposed one criminal conviction assessment of $30. The court was required to impose a criminal conviction assessment for each conviction, and the judgment must be modified to include two additional assessments of $30 each. (*People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3; *People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1328.) Finally, the sentencing minute order and the abstract of judgment include a $20 DNA penalty assessment under Government Code section 76104.7 (incorrectly stated in the minute order as § 76107.7), which was not imposed at the sentencing hearing and was unauthorized without the imposition of a penalty under Government Code section 76104.6. (*People v. Valencia* (2008) 166 Cal.App.4th 1392, 1395–1396.) We direct the

20

trial court to modify the minute order and the abstract of judgment to delete the DNA penalty assessment.

## DISPOSITION

Ronald Ray Thomas's sentence on count 3 is vacated and the matter is remanded for resentencing for the trial court to either double the concurrent two-year sentence to four years or strike the prior strike conviction as to that count. The judgment shall be modified to reflect 75 days of presentence conduct credit, which in addition to the 505 actual days totals 580 days of presentence credit, and to impose two additional criminal conviction assessments of $30 each. Further, the sentencing minute order and the judgment as to count 1 shall be modified to state a total term of 20 years plus life in state prison with a minimum parole eligibility date of 30 years and to delete the $20 DNA penalty assessment. The superior court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21